\UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at KNOXVILLE

| | | |
|---|---|---|
| DONALD DOORNBOS and others similarly situated, | ) ) ) | |
| *Plaintiffs*, | ) ) | Case No. 3:05-cv-428 |
| v. | ) ) | Judge Mattice |
| PILOT TRAVEL CENTERS, LLC, *et al.*, | ) ) ) | |
| *Defendants.* | ) | |

## MEMORANDUM AND ORDER

Plaintiff Donald Doornbos brings the instant action, on behalf of himself and all others similarly situated, against Pilot Travel Centers, LLC and Pilot Corporation d/b/a Haslam Oil Company for failure to pay overtime compensation in violation of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*[1] The over five hundred opt-in Plaintiffs are divided into four subclasses according to their job title: (1) Subclass C – Travel Center General Managers; (2) Subclass D – Travel Center Co-Managers; (3) Subclass E – Restaurant General Managers; and (4) Subclass F – Restaurant Co-Managers.

Before the Court are Defendants' Motions for Summary Judgment as to each of the four subclasses [Court Docs. 105, 108, 110, and 113]. For the reasons explained below, Defendants' Motions for Summary Judgment are **GRANTED** as to Subclasses C and E and **DENIED** as to Subclasses D and F.

---

[1]    The Complaint also originally included a number of violations of California labor laws. All claims arising out of California state law and all claims brought by Plaintiffs residing in California have been resolved and are no longer pending in this action.

## I.      STANDARD

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In ruling on a motion for summary judgment, the Court must view the facts contained in the record and all inferences that can be drawn from those facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). The Court cannot weigh the evidence, judge the credibility of witnesses, or determine the truth of any matter in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of demonstrating that no genuine issue of material facts exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may meet this burden either by producing evidence that demonstrates the absence of a genuine issue of material fact or by simply " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. To refute such a showing, the nonmoving party may not simply rest on its pleadings. *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996); *see Anderson*, 477 U.S. at 249. The nonmoving party must present some significant, probative evidence indicating the necessity of a trial for resolving a material factual dispute. *Celotex*, 477 U.S. at 322. A mere scintilla of evidence is not enough. *Anderson*, 477 U.S. at 252; *McLean v. Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). The Court's role is limited to determining whether

-2-

the case contains sufficient evidence from which a jury could reasonably find for the nonmoving party. *Anderson*, 477 U.S. at 248-49; *Nat'l Satellite Sports*, 253 F.3d at 907. If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323. If the Court concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the evidence presented, it may enter a summary judgment. *Anderson*, 477 U.S. at 251-52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

## II.    FACTS

The facts, viewed in the light most favorable to the Plaintiffs, are as follows.

Defendants Pilot Travel Centers, LLC and Pilot Corporation d/b/a Haslam Oil Company (together "Defendants") own and operate more than 300 Travel Centers across the United States. (Romano Decl. ¶ 3.) Plaintiffs are current and former employees who served as salaried managers at Defendants' Travel Centers since December 11, 1999. (Court Doc. Supp. 1-12, Second Am. Compl., ¶ 1.) The Travel Centers are large, interstate truck stops offering diesel fuel and gasoline, convenience store service and, in most cases, fast food restaurant services. (Romano Decl. ¶ 4.) The Travel Centers are open and operate 24 hours a day, 7 days a week. (Romano Decl. ¶ 5.)

Defendants' Travel Centers are divided into five geographic divisions: West, South Central, Southeast, North Central, and Northeast. (Deposition of Mark Romano from July 8, 2004 ("Romano Dep. II") 44.) There is a Division Director responsible for the operations of each division. (Romano Dep. II 29-30.)

Each division is further broken down into regions, and there are approximately twenty-five regions across the country. (Romano Dep. II at 43-44.) Each region is headed by a Region Manager who oversees anywhere from three to eight stores, with an average of six stores per Region Manager. (Deposition of Robert Greufe from June 10, 2004 ("Greufe Dep. I") 22-23; Kelly Dep. at 11-12.) The Region Managers report directly to the Division Directors. (Romano Dep. II at 44-45.) The Region Managers are responsible for hiring, training, supervising, and reviewing on an annual basis the management staff for each of their Travel Centers. (Greufe Dep. I 23; Kelly Dep. at 33.) They conduct field visits to the Travel Centers during which they meet with the managerial staff, review the financial numbers, check the cleanliness of the stores, and review the overall efficiency of the operation. (Greufe Dep. I 26; Kelly Dep. 48-49.)

Each Travel Center has two components: a convenience store/gas station side that is referred to as the Travel Center side, and a restaurant side which is normally either a Subway, Wendys, Arbys or Dairy Queen franchise. (Romano Decl. ¶ 5.) Every Travel Center has a Travel Center General Manager ("TCGM") who oversees the entire facility – including the restaurant. (Romano Decl. ¶ 6.) Each Travel Center must also have at least one Travel Center Co-Manager ("TCCM"). (*Id*.) The TCCM reports directly to the TCGM but does not generally have supervisory responsibility for the restaurant operations. (*Id*.) Both the TCGM and TCCM are classified as exempt employees and are therefore not paid overtime. (Deposition of Mark Romano on April 20, 2004 ("Romano Dep. I") 118.) Most Travel Centers also employ at least one shift supervisor, office administrator, and/or merchandiser, as well as cashiers and maintenance personnel. These employees are considered non-exempt and are paid overtime for any work in excess of forty hours per

-4-

week.  (Kelly Dep. 80.)

If the Travel Center contains a restaurant component, the restaurant is generally run as a separate endeavor with its own staff and weekly labor schedule. (Romano Decl. ¶ 5.) If the restaurant in the Travel Center is owned by Defendants, the restaurant will have a Restaurant General Manager ("RGM") and may have one or more Restaurant Co-Managers ("RCM") who are exempt employees.  (Romano Decl. ¶ 6; Romano Dep. I 118.) The RGM oversees the day-to-day operations of the restaurant and the RCM, if any, reports directly to the RGM.  (Romano Decl. ¶ 6.)  The restaurants also employ cashiers and food prep personnel, and some employ shift supervisors.  (Romano Dep. II at 146.) These employees are non-exempt and paid on an hourly basis.  (Kelly Dep. at 80.)

Defendants operate the Travel Centers in a top-down manner by using uniform company-wide policies and procedures which are promulgated by their corporate headquarters in Knoxville, Tennessee.  (Romano Dep. I 63-65, 68.)  For instance, Defendants' corporate office provides each Travel Center with a "plan-o-gram" that dictates how the inventory in the Travel Center should be displayed.  (Kelly Dep. 22.)  The plan-o-gram consists of pictures and directions outlining exactly where each item should be placed in the Travel Center.  It is mandatory that each Travel Center implement the plan-o-gram and managers are reprimanded for deviating from it.  (Kelly Dep. 26.)  Defendants' corporate office also provides the Travel Centers with offensive and defensive "must lists" which are basically checklists that the Region Manager and TCGM use to rate each Travel Center's performance.  (Kelly Dep. 4.)  Defendants provide detailed checklists that must be followed for all of the non-managerial tasks, as well as many of the managerial tasks such as closing out the register.  (Gray Decl. ¶ 9.)  Even the weekly labor schedule is filled

out in accordance with a form provided by Defendants' corporate offices and Defendants have established "Best Labor Practices" that the managers are to follow in staffing their Travel Centers.   (Leach Decl. ¶ 10.)

Labor is Defendants' largest and most easily controlled expense.  (Gruefe Dep. 128.)   In 2002, Defendants developed and implemented a "Labor Matrix" which is a budgeting tool that is used to allocate the appropriate number of man-hours for each Travel Center.[2]  (Clothier Dep. 22; Romano Dep. I 193-95.)  The Labor Matrix takes into account factors such as the Travel Center's sales volume, square footage, and number of daily transactions, and produces a weekly labor budget for each location.  (Romano Dep. I 193.)

The labor budget allocates the number of management and non-management hours available for each Travel Center.   (Clothier Dep. 53; Romano Dep. I 196.)   The weekly labor schedule is prepared by the TCGM in accordance with this budget. The Labor Matrix assumes that the exempt employees, the TCGM and TCCMs, will work at least 54 hours per week.  (Romano Dep. II 126; Clothier Dep. 33.)   "Management" hours are to be filled by the TCGM, TCCM(s), and the Shift Supervisors.  (Clothier Dep. 54.)  Shift Supervisors are hourly employees who are sometimes left in charge of the Travel Centers and have many of the same managerial responsibilities as the TCGMs and TCCMs.  (Bishop Decl. ¶ 15; Hughes Decl. ¶ 23.)

No formal studies were conducted in the development of the Labor Matrix; rather, Defendants relied on the operational knowledge of a few employees with regard to how the

---

[2]        The labor matrix does not apply to the restaurant side of the Travel Centers.  (Clothier Dep. 34.)  The restaurants are given a labor budget by Defendants but that budget is based solely on sales volume and the target labor percentage of sales.  (*Id*. at 34-35.)

-6-

Travel Centers were most effectively staffed. (Clothier Dep. 23, 28-29, 41.) Defendants expect the Travel Center's managers to spend more than fifty percent of their time on management tasks but have never performed a time-motion study to evaluate how their management team actually spends their time. (Parmly Dep. 47-48, 162-63.) In reality, the entire management staff spends well in excess of fifty percent of their time performing non-managerial duties. (*See* Court Doc. 120 ¶ 37; Court Doc. 125 ¶ 37; Court Doc. 128 n.12; Court Doc. 132 at 10-11.)

## III. THE FLSA AND THE EXECUTIVE EXEMPTION

The Fair Labor Standards Act ("FLSA") was enacted in 1938 for the purpose of eliminating "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." 29 U.S.C. § 202(a). To this end, the FLSA requires employers to compensate any employee not covered by a specific exemption for hours worked in excess of forty hours a week, "at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). Given the Act's broad and remedial purpose, exemptions to the overtime requirement of the FLSA "are to be narrowly construed against employers." *Salyer v. Ohio Bureau of Workers' Compensation*, 83 F.3d 784, 786 (6th Cir.1996).

The FLSA specifies that "any employee employed in a bona fide executive, administrative or professional capacity" is exempt from the overtime requirements. 29 U.S.C. § 213(a)(1). An employer who invokes one of the exemptions bears not only the burden of proving that an employee falls within the exemption, but also the burden on each element of the claimed exemption. *Martin v. Indiana Michigan Power Co.*, 381 F.3d 574,

578 (6th Cir. 2004). While the question of how an employee spends his time is a question of fact, the question of whether the employee's particular activities exclude them from the overtime benefits of the FLSA is a question of law. *Jastremski v. Safeco Ins. Cos.*, 243 F. Supp. 2d 743, 747 (N.D. Ohio 2003); *see also Ale v. Tennessee Valley Authority*, 269 F.3d 680, 691 (6th Cir. 2001) (noting that "ultimate question" of whether an employee is exempt is a question of law).

At issue in this case is whether Plaintiffs fall within the "executive exemption" to the FLSA's overtime provisions. The term "bona fide executive capacity" is not defined in the FLSA; rather, Congress delegated the responsibility for defining the term to the Secretary of Labor. *See* 29 U.S.C. § 213(a)(1); 29 C.F.R. § 541.100 *et seq*. The applicable regulations were revised substantially in 2004 and the new regulations were not made to apply retroactively. *See Kennedy v. Commonwealth Edison Co.*, 410 F.3d 365, 369 (7th Cir. 2005). Out of the over five hundred opt-in Plaintiffs in this action, only seventy-four performed work after the regulations were amended in 2004. (Romano Decl. ¶¶ 16-19 & Ex. 5.) Accordingly, the former version of the regulations applies to the majority of the work at issue in this case and the Court will primarily address its analysis to the pre-2004 regulations.

Prior to 2004, the regulations set forth a "short test" and "long test" for determining whether an employee was a bona fide executive. Whether to apply the "short test" or the "long test" was dependent on the weekly salary of the employee. The "short test" applied to employees, like Plaintiffs in this case, who made over $250 per week. A bona fide executive employee under the "short test" was one whose "primary duty consists of the

management of the enterprise" and "includes the customary and regular direction of the work of two or more other employees." 29 C.F.R. § 541.119(a) (2003); 29 C.F.R. § 541.1(f) (2003). Under the "short test," an employee's authority to hire and fire his subordinates was to be considered as part of whether that employee's primary duty was management. 29 C.F.R. § 541.102(b) (2003).

The 2004 amendments to the regulations eliminated the "short" and "long" tests, instead setting forth a single test in which a bona fide executive employee was: (1) "[c]ompensated on a salary basis at a rate of not less than $455 per week"; (2) one whose "primary duty is management of the enterprise in which he is employed or of a customarily recognized department or subdivision thereof"; (3) one who "customarily and regularly directs the work of two or more other employees"; and (4) one who "has the authority to hire or fire other employees" or their "suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight." 29 C.F.R. § 541.100(a) (2004). The significant changes after the 2004 amendments were the change in minimum salary from $250 to $455 per week and the elevation of the authority to hire and fire employees from a factor within the primary duty analysis to a free-standing element of the exemption. *Compare* 29 C.F.R. § 541.119(a) (2003); 29 C.F.R. § 541.1(f) (2003) *with* 29 C.F.R. § 541.100(a) (2004).

A.      **The Salary Requirement**

The parties do not dispute that the Plaintiffs were compensated in excess of $250 per week prior to the 2004 amendments and in excess of $455 per week for any work performed after the regulations were amended. (Romano Decl. ¶ 7.) Accordingly,

Defendants have met their burden as to the first element of both the short test and the current test and the Court need not further analyze this element.

**B.     Management as Primary Duty**

The second element requires Defendants to establish that management was the Plaintiffs' primary duty.  "A determination of whether an employee has management as his primary duty must be based on all the facts in a particular case."  29 C.F.R. § 541.103 (2003).  A court determining whether an employee's primary duty is management "cannot rely upon the plaintiff's or the employer's *description* of the plaintiff's position or authority; instead [it] must 'look at the plaintiff's *actual duties.*'" *Thomas v. Speedway Superamerica, LLC*, 506 F.3d 496, 503 (6th Cir. 2007).

The regulations provide guidance on what categories of work constitute "management":

> Interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing their work; maintaining their production or sales records for use in supervision or control; appraising their productivity and efficiency for the purpose of recommending promotions or other changes in their status; handling their complaints and grievances and disciplining them when necessary; planning the work; determining the techniques to be used; apportioning the work among the workers; determining the type of materials, supplies, machinery or tools to be used or merchandise to be bought, stocked or sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety of the men and the property.

29 C.F.R. § 541.102(b) (2003).  The amount of time spent in performance of managerial duties is a useful guide in determining whether management is the primary duty of an employee.  29 C.F.R. § 541.103 (2003).  The time spent on management duties is not,

-10-

however, determinative of whether management is an employee's primary duty.  29 C.F.R. § 541.103 (2003); *Thomas*, 506 F.3d at 504.  "'Primary duty' does not mean the most time-consuming duty; it instead connotes the 'principal' or 'chief' – meaning the most important – duty performed by the employee." *Thomas*, 506 F.3d at 504.

The parties do not genuinely dispute that Plaintiffs spent a majority of their time performing non-management duties.  "In situations where the employee does not spend over 50 percent of his time in managerial duties, he might nevertheless have management as his primary duty if the other pertinent factors support such a conclusion." *Thomas*, 506 F.3d at 505 (quoting 29 C.F.R. § 541.103 (2003)).  These "other pertinent factors" are: (1) the relative importance of the managerial duties as compared with the other types of duties; (2) the frequency with which the employee exercises discretionary powers; (3) the employee's relative freedom from supervision; and (4) the relationship between the employee's salary and the wages paid to other employees for similar nonexempt work.  *Id*.

Under the first factor, "courts must compare the importance of the plaintiff's managerial duties with the importance of [their] non-managerial duties, keeping in mind the end goal of achieving the overall success of the company." *Thomas*, 506 F.3d at 505.  The focus is not on whether a managerial or non-managerial employee is more important but on whether the categories of duties performed, managerial or non-managerial, are more important to the overall success of the enterprise.  *Id*.

The plain language of the second factor "instructs courts merely to focus on the prevalence or regularity of the plaintiff's discretionary decisions." *Thomas*, 506 F.3d at 506.  An employee can have management as his primary job function even if his discretion

is circumscribed to a certain extent by company polices, manuals, and the oversight of a regional manager. *Thomas*, 506 F.3d at 507. In weighing this factor, the Court must consider whether the company's guidelines and procedures "contemplate independent judgment calls or allow for deviations." *Renfro v. Indiana Michigan Power Co.*, 497 F.3d 573, 577 (6th Cir. 2007). The Court must also consider the types of tasks over which an employee has discretion. The more important the matter over which the employee exercises discretion, the more likely it is that management is that employee's primary duty. *Thomas*, 506 F.3d at 506.

The third factor contemplates an employee's "relative freedom from supervision." When an employee operates on a day-to-day basis without any other employee as her equal and without a supervisor looking over her shoulder, this factor weighs in favor of a finding that management is her primary duty. *Thomas*, 506 F.3d at 507. "A district manager's periodic visits, as often as a few days a week, do not negate a finding that the store manager operates free from supervision when the district manager is absent." *Id*. Neither does a store manager's frequent, even daily, communications with her district manager compel a finding that the store manger is subject to "exacting supervision." *Id*. The number of stores that a regional manager oversees is a factor in determining whether a regional manager's oversight is such that it overbears the discretion of the other managing employees. *See id*. at 508 (comparing a regional manager's oversight of three stores to that of twelve stores).

The fourth factor requires the Court to inquire into the relationship between the employees's salary and the wages paid other employees for the kind of nonexempt work

performed by the employee. *Thomas*, 506 F.3d at 509. If an employee is paid in excess of thirty percent more than their subordinate employees for similar work, this factor weighs in favor of finding that management is the employee's primary duty. *Id*.

## C. Customarily and Regularly Directs the Work of Two or More Employees

The requirement that exempt employees customarily and regularly supervise two or more full-time employees has two components: (1) that the exempt employees are responsible for supervising two or more employees; and (2) that such supervision is "customary and regular." *Perez v. Radioshack Corp.*, 552 F.Supp.2d 731, 737 (N.D. Ill. 2005).

### 1. *Two or more employees*

The regulations provide that an employee qualifies as an "executive" only if he customarily and regularly directs the work of two or more other employees. 29 C.F.R. § 541.100. Courts have interpreted this to mean that an employee must supervise at least eighty hours of subordinate work. *Perez*, 552 F.Supp.2d at 737. The regulations make clear that these eighty hours can be fulfilled by two full-time employees working forty hours each, a number of part-time employees or any combination thereof as long as the total hours supervised exceeds eighty. 29 C.F.R. § 541.104(a). The hours worked by nonexempt employees cannot be used to fulfill the eighty hour requirement for more than one exempt employee. 29 C.F.R. § 541.104(d). "Thus, for example, a department with five full-time nonexempt workers may have up to two exempt supervisors if each such supervisor customarily and regularly directs the work of two of those workers." 29 C.F.R. § 541.104(b). Shared responsibility for the supervision of the same two employees does

-13-

not satisfy this provision.  29 C.F.R. § 541.104(d).  "An employee who merely assists the manager of a particular department and supervises two or more employees only in the actual manager's absence does not meet this requirement."  29 C.F.R. § 541.104(c).

## 2. *Customarily and regularly*

The regulations provide that an employee must "customarily and regularly" supervise the work of two or more employees.  The terms "customarily and regularly" signify "a frequency which must be greater than occasional but which, of course, may be less than constant."  20 C.F.R. § 541.107(b).  When a manager supervises eighty subordinate work hours less than seventy-six percent of the time, he does not "customarily and regularly" direct the work of two or more employees.  *Sec'y of Labor v. Daylight Dairy Prods., Inc.*, 779 F.2d 784, 788 (1st Cir. 1985).  One court has held that an employee must supervise two or more employees at least eighty percent of the time to meet the "customarily and regularly" requirement.  *Perez*, 552 F.Supp.2d at 742.

## D. Authority to Hire and Fire

Since the 2004 amendments, in addition to the elements outlined above, it has been an element of the executive exemption that an employee have "the authority to hire or fire other employees or his suggestions and recommendations as to the hiring, firing, advancement, promotion or other change of status of other employees are given particular weight."  29 C.F.R. § 541.100.  Accordingly, for any work performed by Plaintiffs after August 23, 2004, Defendants must prove by a preponderance of the evidence that Plaintiffs met the above requirement.

The phrase "particular weight" is defined in the regulations:

> To determine whether an employee's suggestions and recommendations are given "particular weight," factors to be considered include, but are not limited to, whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon. Generally, an executive's suggestions and recommendations must pertain to employees whom the executive customarily and regularly directs. It does not include an occasional suggestion with regard to the change in status of a co-worker. An employee's suggestions and recommendations may still be deemed to have "particular weight" even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status.

29 C.F.R. § 541.105 (2004).

The regulations do not define "change of status." But the Secretary of Labor explains in the Preamble to the regulations that this phrase should "be given the same meaning as that given by the Supreme Court in defining the term 'tangible employment action' for purposes of Title VII liability." 69 Fed.Reg. 22,131 (April 23, 2004). The Supreme Court has explained that a tangible employment action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).

## IV.  ANALYSIS

The Court will apply the above-described legal and regulatory framework to each class of Plaintiffs.

-15-

## A.    Travel Center General Managers

The parties do not genuinely dispute that the TCGMs customarily and regularly directed the work of at least two full-time employees.  Nor do the parties genuinely dispute that the TCGMs had the authority to hire and fire subordinate employees.  Accordingly, the only element of the executive exemption at issue with respect to the TCGMs is whether management was their primary duty.

It is undisputed that the TCGMs performed many of the tasks that the regulations classify as management.  The TCGMs interviewed and hired employees to fill the cashier and maintenance positions at the Travel Centers.  (Kelly Dep. 29; Greufe Dep. 27; Johnson Decl. ¶ 10.)  Although TCGMs did not personally train new hires, they directed other employees to provide the necessary training and ensured that it occured.  (Johnson Decl. ¶ 12; Torrento Dep. 90; Leach Dep. 48.)  They completed the weekly schedule for all of the employees – both salaried and hourly.  (Leach Decl. ¶ 10.)  The TCGMs also conducted a daily "manager's walk" at the beginning of each shift and had the authority to direct employees to do whatever needed to be done on that shift.  (Torrento Dep. 84; Leach Decl. ¶ 11.)  If someone failed to show up for a scheduled shift, they made the determination as to how to reallocate the workload.  (Torrento Dep. 86.)  They completed or signed off on evaluations of the hourly employees that were used to determine pay increases.  (Wiley Dep. 83; Gray Dep. 63.)

It is also undisputed, however, that the TCGMs also performed a number of non-management duties.   In fact, the evidence shows that they spent from sixty to eighty percent of their time on non-managerial duties.  (Court Doc. 120, Pl.'s Statement of Material Facts Class C, ¶ 38.)  For example, they completed a count of the cigarette stock

-16-

on a daily basis. (Torrento Dep. 81.) They regularly stocked shelves and arranged the inventory according to the corporate plan-o-grams. (Torrento Dep. 87-88; Gray Decl. ¶ 15.) They often operated the cash register and were sometimes at the register in excess of three hours in a shift. (Wiley Dep. 84.) They cleaned the Travel Center and performed maintenance on the showers, restrooms and the fuel islands. (Gray Decl. ¶ 15; Johnson Decl. ¶ 25.)

Because it is undisputed that the TCGMs spent in excess of fifty percent of their time performing non-management tasks, the Court must evaluate the remaining factors to determine whether management was their primary duty.

### 1.   _Relative importance of managerial and non-managerial duties_

The TCGMs argue that their non-managerial duties were more important to Defendants because Defendants' primary motivation was to minimize labor costs. (Court Doc. 122, Pl's Class C Br. at 21-22.) The TCGMs argue that Defendants' emphasis on the reduction of labor costs limited their ability to fully staff the Travel Centers and that they were forced to perform many non-managerial duties as a result of the lack of hourly staff. (Pl.'s Class C Br. at 21-22.)

It is undisputed that Defendants emphasized controlling labor costs as the key to improving the profitability of the Travel Centers. (Sanford Decl. exs. W2, W3, W5.) Defendants' emphasis on controlling labor costs does not, however, necessarily mean that the TCGMs' non-managerial job duties were more important to the overall success of the enterprise than their managerial duties. If the TCGMs failed to perform their non-managerial duties, their Travel Centers would still function, albeit much less effectively. Customers may have to wait longer for service at the cash register and the stores'

-17-

cleanliness would certainly be affected. The same is not true, however, if the TCGMs failed to perform their managerial duties. The Travel Centers would cease to function altogether if the TCGMs did not hire employees, complete the weekly schedule, and order inventory for the store. Accordingly, Defendants' desire to control labor costs to increase overall profitability does not mean that the TCGMs' non-managerial duties were more important than their non-managerial duties. *See Thomas*, 506 F.3d at 505-06 (where gas station would cease to function if plaintiff failed to perform managerial duties this factor weighs in favor of management as the employee's primary duty).

The TCGMs also argue that their job description shows that their non-managerial tasks were more important than their managerial tasks. Defendants' job description for the TCGM states that "assist[ing] in carrying out the same type of work as that performed by subordinate employees, i.e. waiting on customers, conducting counts, etc." is one of their "principle (sic) tasks." (Parmly Dep. ex. 14.) Out of the eleven "principle (sic) tasks" listed in the TCGMs' job description, however, that is the only one that contemplates them taking on non-managerial duties. (*Id.*) The other "principle (sic) tasks" are all managerial tasks, including recruiting, hiring, and training new employees, responding to customer complaints, dealing with employee satisfaction issues, and ensuring compliance with federal, state, and local regulations. (*Id.*) The TCGMs' job description does not, therefore, support their contention that their non-managerial tasks are Defendants' primary concern.

Moreover, the Court has compared the TCGMs' job duties to those of the plaintiff in *Thomas* and finds them strikingly similar. In *Thomas v. Speedway SuperAmerica, LLC,* 506 F.3d 496 (6th Cir. 2007), the Sixth Circuit held that "Thomas's managerial duties were

much more important to Speedway's success than her non-managerial duties" and therefore "the first factor strongly indicates that Thomas's primary duty consisted of management." *Id.* at 505; *see also Baldwin v. Trailer Inns, Inc.*, 266 F.3d 1104, 1115 (9th Cir. 2001) (plaintiffs' principal value to defendant was directing the day-to-day operations of the business even though they performed a substantial amount of manual labor). Accordingly, the Court holds that the first factor here strongly indicates that the Travel Center General Managers' primary duty consisted of management.

2.    *Frequency of the exercise of discretion*

Defendants contend that the TCGMs exercised a significant amount of discretion in "running the shift" and "directing day-to-day activities of the center." (Court Doc. 105-2, Def.'s Class C Br.. ¶ 13.) The TCGMs argue that they had little discretion on a day-to-day basis due to Defendants' strict company policies, the limited labor budget, and overbearing Region Managers. (Pl.'s Class C Br. at 23-25.)

The Court finds that the TCGMs did not regularly exercise a significant amount of discretion. Putting aside the vast amount of time that they spent on non-managerial activities that required no discretion, detailed corporate policies significantly limited their discretion with regard to their managerial tasks. For instance, they counted and ordered inventory to stock the Travel Centers, which is a management task under the regulations. 29 C.F.R. § 541.102(b) (2003). No discretion was required, however, because both the amount and type of goods to be ordered was dictated by Defendants' corporate office. The TCGMs were given "build-tos" that set forth how much of each item was to be in stock at all times and they simply ordered enough of each item to fulfill the "build-to." (Johnson Decl. ¶ 21; Torrento Decl. ¶ 19; Leach Decl. ¶ 18.) They had no discretion with regard to

-19-

the type or the price of the items sold in the Travel Centers. (Johnson Decl. ¶ 18; Torrento Decl. ¶ 17; Gray Decl. ¶ 12; Leach Decl. ¶ 15.) The TCGMs also had no discretion to decide where or how to display the inventory – that was dictated by the "plan-o-grams" provided by Defendants. (Romano Dep. I 216-18; Kelly Dep. 20-24.)

The TCGMs completed daily and weekly reports for corporate headquarters – which are also management tasks under the regulations. *See* 29 C.F.R. § 541.102(b) (2003). These reports did not require the exercise of any discretion, however, as they were done according to corporate policy and simply involved inputting data and transmitting the information to corporate headquarters. (Gray Dep. 46-47.) The reports did not require the TCGMs to make any judgment calls or allow for deviation from the guidelines. (*Id.*)

The TCGMs completed the weekly schedule for all of the Travel Center employees, which is a managerial task under the regulations. 29 C.F.R. § 541.102(b) (2003). The discretion involved with the scheduling of employees was severely circumscribed, however, by the labor budget provided by Defendants' corporate offices. The labor budget was so limited that there was basically only one way to schedule the employees to ensure that the Travel Center was adequately staffed and that the Center stayed within its labor budget. (Leach Decl. ¶ 10.) Once the they were able to craft a schedule that adequately staffed the Travel Center and stayed within budget, they typically used the same schedule each week. (*Id.*)

Defendants contend that the TCGMs exercised significant discretion on a day-to-day basis because they were responsible for running the shift and directing the activities of the Travel Center. (Def.'s Statement of Facts Class C ¶ 13.) The limited labor budget given to the each Travel Center, however, meant that they were staffed so leanly that there was

-20-

not enough hourly staff for the TCGMs to move around during the shift. (Leach Decl. ¶ 11.) Instead of directing the hourly staff to do whatever maintenance or cleaning was necessary, the TCGMs were forced by the limited staffing to do these non-managerial tasks themselves.

Moreover, the hourly employees' tasks were each driven by detailed check-lists provided by the corporate office. (Gray Decl. ¶ 9.) If the TCGMs directed hourly employees to change tasks – for example, moving an employee out from behind the register to stocking the shelves – their discretion was limited to telling the hourly employees to move from one task list to another. (Gray Decl. ¶ 9.) These detailed corporate policies, coupled with the limited labor budgets, significantly curtailed any discretion that the TCGMs might have been able to exercise.

Additionally, Defendants' corporate policies significantly limited the amount of discretion that the TCGMs exercised with regard to important matters. For instance, they could handle minor employee or customer complaints but were directed to refer more serious complaints to Defendants' corporate office. (Gray Decl. ¶ 10.) With regard to hiring, they were required to give a test to applicants and could then interview and offer positions only to those who had qualifying scores. (Torrento Decl. ¶ 9.) Defendants set the pay scale for the hourly employees and the TCGMs could vary by only a few cents without approval of their Region Manager. (Leach Dep. 47; Gray Dep. 63.)

Viewing the facts in the light most favorable to the Travel Center General Managers, therefore, it is apparent that they exercised little discretion on a day-to-day basis and had little discretion over "matters of importance." Accordingly, the second factor weighs in favor of finding that management was not the Travel Center General Managers' primary duty.

-21-

3. _Relative Freedom from Supervision_

It is undisputed that the TCGMs were the highest ranking employees at their respective Travel Centers.  Although their discretion was constrained by corporate policies, they generally operated on a day-to-day basis without any other _employee_ looking over their shoulder.  This weighs heavily in favor of finding that management was their primary duty.  _Thomas_, 506 F.3d at 507.

The TCGMs argue that the Region Managers' significant oversight prevented the TCGMs from operating without supervision.  Even though the Court must view the facts in the light most favorable to the Plaintiffs and draw all reasonable inferences in their favor, the Sixth Circuit has explicitly held that the Court need not accept their contention that the Region Managers were, in effect, always present and omnipotent.  _Thomas_, 506 F.3d at 506.  Instead, the Court must look at the facts to evaluate how much oversight each Region Manager exercised over the Travel Centers.  _Id_.

Region Managers typically visited each Travel Center at least monthly, but sometimes bi-weekly.  (Torrento Decl. ¶¶ 6-7; Leach Decl. ¶ 7; Johnson Decl. ¶¶ 7-8; Gray Decl. ¶ 7.)  During these in-person visits, the Region Managers would oversee inventory audits, ensure that the TCGMs were properly implementing corporate policies, and address any serious employee complaints or customer concerns.  (Johnson Decl. ¶ 8; Gray Decl. ¶ 7.)  The in-store visits typically lasted a couple of hours but could last an entire day or two if the store was being inventoried or having other issues that required more attention.  (Johnson Decl. ¶ 8.)   After these visits, the Region Managers would often leave their TCGMs explicit instructions with regard to areas that needed improvement.  (_Id_.)

Between in-person visits, the TCGMs would speak with their Region Managers by telephone a few times per week. (Leach Decl. ¶ 7; Johnson Decl. ¶ 8.) They would also correspond by e-mail. (Torrento Decl. ¶ 7.) In these communications, the Region Managers would discuss day-to-day operations of the Travel Centers, go over weekly reports, and provide direction on implementing corporate policy. For example, the Region Managers occasionally reminded the TCGMs of an upcoming deadline or weekly task that needed to be completed via e-mail. (*Id.*) If a Travel Center exceeded its labor budget the previous week, the Region Manager would often contact the TCGM to discuss alternative staffing approaches that fit within the Travel Center's personnel budget. (Gray Decl. ¶ 7.)

The TCGMs argue that this evidence shows that the Region Managers were so integrally involved in the operations of the Travel Centers that they functioned as the *de facto* management. The Sixth Circuit has held, however, that "[a] district manager's periodic visits, as often as a few days each week, do not negate a finding that the store manager operates free from supervision when the district manager is absent." *Thomas* , 506 F.3d at 507. Moreover, a regional manager's availability by phone or email for advice "does not detract in any substantial way from a finding that the store manager was relatively free from supervision." *Thomas*, 506 F.3d at 508.

In this case, the Region Managers visited each Travel Center at most bi-weekly and communicated electronically with the TCGMs only a few times per week. A manager need not be completely free from supervision to be classified as exempt; the Court is to consider only a manager's "relative freedom from supervision." *Thomas*, 506 F.3d at 507. The level of supervision here is much less pervasive than in those cases in which courts have held

that managers were not exempt. *See*, *e.g.*, *Smith v. Heartland Auto Servs, Inc.*, 418 F. Supp. 2d 1129, 1137 (D. Minn. 2006) (denying summary judgment because district managers "were at the stores almost every day of the week for hours at a time.").

Nor does the number of Travel Centers each Region Manager oversaw favor Plaintiffs in this case. Each Region Manager was responsible for between three and eight Travel Centers. (Greufe Dep. 22-23; Kelly Dep. I at 11-12.) Defendants have actively worked to reduce the number of Travel Centers assigned to each Region Manager, and the ratio of Travel Centers to Region Managers is now 5.9:1. (Greufe Dep. 22-23.) The Court finds that approximately six stores per Region Manager is not so few that the Region Managers would obviously be intimately involved in every aspect of the Travel Center's operations, but is also not so many that the Region Manager could not maintain significant oversight. *Compare Cowan v. Treetop Enters., Inc.*, 120 F.Supp.2d 672, 675 (M.D. Tenn. 1999) (granting plaintiff's motion for summary judgment in part because managers reported directly to a regional manager who oversaw only 3 stores) with *Posely v. Eckerd Corp.*, 433 F.Supp.2d 1287, 1304 (S.D. Fla. 2006) (granting summary judgment to defendant where regional manager oversaw 25 stores). Accordingly, the number of Travel Centers assigned to each Region Manager does not weigh in favor of either party in this case.

Defendants' company policies and procedures, while limiting the TCGMs' discretion in many regards, were not so detailed and rigorous so as to undermine the fact that the they operated relatively free from supervision on a day-to-day basis. *See Baldwin*, 266 F.3d at 1115 (existence of company policies and checklists does not alter the conclusion that employees operated free from supervision).

Viewing the facts in the light most favorable to the TCGMs, it is clear that they operated relatively free from supervision the majority of the time. Accordingly, the third factor weighs in favor of finding that management was their primary duty.

4. *Relationship between the employee's salary and the wages paid to other employees for similar work*

Defendants required that the TCGMs work at least fifty hours a week but maintained no records of how many hours they actually worked. (Greufe Dep. 88-89.) The Labor Matrix that was used to devise the weekly labor budget for both managerial and non-managerial hours assumed that the TCGMs would work at least 54 hours per week. (Romano Dep. II at 126; Clothier Dep. 33.) The evidence shows that the limited labor budget actually forced the TCGMs to work between fifty-five and sixty-five hours per week. (Gray Decl. ¶ 5; Johnson Decl. ¶ 5; Leach Decl. ¶ 5; Torrento Decl. ¶ 4.)

With regard to salary, the TCGMs' average annual wage was $43,126.54, plus a possible quarterly bonus. (Romano Decl. ¶ 10.) They often did not receive a quarterly bonus and some never received a bonus. (Leach Decl. ¶ 3; Torrento Decl. ¶ 3.)

Assuming that the TCGMs worked sixty hours a week and not counting any bonuses paid, they made an average of $13.82 per hour.[3] The hourly employees that they supervised made between $7.00 and $11.00 per hour. (Wiley Dep. 120; Romano Dep. 148.) Using the average hourly employee salary of $9.00 per hour[4], the TCGMs were paid over fifty percent more than the employees they supervised. The highest paid hourly

---

[3] The parties do not discuss the Travel Center General Managers' vacation schedule, if any, so this figure assumes that they worked fifty-two weeks per year.

[4] $7.00 + 11.00 = 18.00 ÷ 2 = $9.00.

employees, whose work most closely resembled that done by the TCGMs, made up to $11 an hour. Comparing the TCGMs salary to the rate paid those employees, the TCGMs were paid twenty-six percent more than the hourly employees for the same kind of work.

The Sixth Circuit has held that when a manager makes thirty percent more than her subordinates for similar work, this factor weighs in favor of finding that management is the employee's primary duty. *Thomas*, 506 F.3d at 509. Here, the TCGMs were paid in excess of fifty percent more than the average hourly worker and twenty-six percent more than the highest paid hourly workers. Accordingly, the fourth factor weighs in favor of finding that management was the TCGMs' primary duty.

     5.   *Conclusion*

With regard to the TCGMs, the only element of the executive exemption in dispute is whether their primary duty was management. Clearly the fact that they spent between sixty and eighty percent of their time on non-managerial tasks weighs in favor of the finding that management was not their primary duty. So too does the fact that they did not regularly exercise a significant amount of discretion, especially with regard to important managerial tasks. Three of the four factors discussed above, however, weigh in favor of finding that management is their primary duty.

The Court concludes that summary judgment in favor of Defendants is appropriate even though not every factor weighs in favor of such a finding. *See Thomas v. Jones Restaurants, Inc.*, 64 F. Supp. 2d 1205, 1214 (M.D. Ala. 1999) ("The presence or absence of any one factor is not determinative [of whether the executive exemption applies], the court must look at the total picture."). The United States Court of Appeals for the Sixth

Circuit has explicitly held that an employer's burden "applies to every *element* of the [executive] exemption, not every factor under every element." *Thomas v. Speedway Superamerica, LLC*, 506 F.3d 496, 505 n.6 (6th Cir. 2007).

In *Thomas*, the Sixth Circuit affirmed the district court's grant of summary judgment in favor of the employer finding that Speedway had met its burden of showing that management was the plaintiff's primary duty. The similarity between the plaintiff's duties and responsibilities in *Thomas* and the duties and responsibilities of the TCGMs in this case is striking. The nature of the business enterprise at issue in *Thomas* and here is nearly identical. Although whether management is an employee's primary duty is a fact-intensive analysis that is to be performed on a case-by-case basis, because the facts of the *Thomas* case are so closely analogous to the facts of this case (at least with respect to the TCGMs), the Court finds the *Thomas* decision to be particularly compelling.

As previously noted, the question of how an employee spends his time is a question of fact, while the question of whether his activities fall within the executive exemption is a question of law. *Jastremski v. Safeco Ins. Cos.*, 243 F. Supp. 2d 743, 747 (N.D. Ohio 2003). Having viewed all of the facts in the light most favorable to the TCGMs, the Court concludes that Defendants have met their burden of showing that management was the TCGMs' primary duty. Accordingly, Defendants have met their burden with respect to each and every element of the executive exemption and their Motion for Summary Judgment as to Class C Plaintiffs (Travel Center General Managers) is **GRANTED**.

**B.** **Restaurant General Managers**

The parties do not genuinely dispute that the RGMs had the authority to hire and fire other employees. Accordingly, the Court will evaluate only whether they customarily and regularly supervised two or more employees and whether management was their primary duty.

1. *Customarily and regularly directed the work of two or more employees*

The RGMs argue that Defendants have failed to meet their burden with respect to the third prong of the short test – that is, showing that the RGMs customarily and regularly directed the work of two or more employees. (Court Doc. 124, Pl.'s Class E Br. at 20-21.) The RGMs point to evidence showing some RGMs frequently worked alone or with only one other employee. (Biebinger Decl. ¶ 5; Simon Decl. ¶ 8.) They argue that this creates a factual dispute as to whether they were customarily and regularly supervising the work of two or more employees. (Pl.'s Class E Br. at 20-21.)

The RGMs argument fails, however, because a manager is not required to be physically present alongside their employees in order to be "customarily and regularly supervising" them. *See*, *e.g.*, *Smith v. Heartland Automotive Services, Inc.*, 418 F.Supp.2d 1129, 1141 (D. Minn. 2006) ("there is no requirement that, in order to supervise an employee, a manager must be constantly physically present at the store with that employee."); *Sturm v. TOC Retail, Inc.*, 864 F.Supp. 1346, 1354 (M.D. Ga. 1994) (manager who ensured subordinates complied with company policy and evaluated their performance was "managing" even though he was not physically present). So long as a manager oversees a subordinate's work while not physically present – for instance by leaving the

employee instructions, reviewing the employee's performance or being available for consultation – they are supervising that work. *Id.*

The facts show that the RGMs supervised the restaurants' employees even while they were not physically present. The RGMs were held responsible for mistakes made by the hourly employees even if they were not on duty while the mistake occurred. (Simon Dep. 89.) They completed the weekly schedule. (Simon Dep. 104; Nelson Dep. 98-99; Slack Dep. 57; Trejo Dep. 87.) They completed periodic performance evaluations. (Nelson Dep. 100; Slack Dep. 73; Trejo Dep. 106.) Some RGMs held meetings with all of the restaurants' employees to review areas that needed improvement and address employee complaints. (Abt Dep. 51.) This evidence shows that the RGMs were supervising the work of the restaurants' employees even when they were not physically present.

It is undisputed that the restaurants were open twenty-four hours a day, seven days a week, which totals 168 hours per week. Assuming that the RGMs worked an average of sixty hours per week, the restaurant was staffed by at least one subordinate employee for 108 hours a week. To fulfill this prong of the short test, a manager must supervise at least eighty hours of subordinate work. That work can be performed by any number of employees so long as it totals more than eighty hours. 29 C.F.R. § 541.104(a); *see also Perez*, 552 F.Supp.2d at 737. Because the RGMs were supervising the restaurants' employees even when not physically present, there is no dispute that they directed more than eighty hours of subordinate work on a customary and regular basis.

Accordingly, the Court finds that Defendants have met their burden as to this element of the executive exemption.

-29-

2.    _Management as primary duty_

It is undisputed that the Restaurant General Managers performed many of the tasks that the regulations classify as management.  While the TCGMs usually did the actual hiring of the restaurants' employees, the RGMs were intimately involved in the interview and selection process.  (Washington Dep. 80; Biebinger Dep. 31; Simon Dep. 43.)  While they did not always personally train new hires, the RGMs were ultimately responsible for the training of the restaurants' employees and ensured that each new employee received the training they needed.  (Abt Dep. 67; Washington Dep. 55; Simon Dep. 85-86; Nelson Dep. 97.)  They completed staff evaluations and either conducted or participated in the employees' performance reviews. (Washington Dep. 83;  Simon Dep. 51, 70; Nelson Dep. 100; Slack Dep. 73; Trejo Dep. 106.)  The RGMs completed the weekly schedule for all of the restaurants' employees.  (Simon Dep. 104; Nelson Dep. 98-99; Slack Dep. 57; Trejo Dep. 87.) During a shift, they allocated work between the employees and had the authority to shift work from one employee to another.  (Simon Dep. 50-51; Abt Dep. 63.)  They were expected to ensure that the restaurants' employees complied with company policy. (Nelson Dep. 98; Trejo Dep. 85; Washington at 82.)  When an employee had issues, the RGMs counseled or disciplined the employee and also handled any employee complaints. (Washington at 55; Biebinger Dep. 73;  Trejo Dep. 91, 110; Nelson Dep. 100; Slack Dep. 58.)  The RGMs did weekly inventory counts and ordered the necessary supplies for the restaurants.  (Abt Dep. 28; Nelson Dep. 106-07.)

It is also undisputed that, regardless of the fact that the RGMs had the authority to do many managerial tasks, they spent the vast majority of their time on their non-managerial duties.  In fact, the evidence shows that the RGMs spent about eighty percent

-30-

of their time on non-managerial duties.  (Biebinger Decl. ¶ 5; Simon Decl. ¶ 16; Gant Dep. 121.)  They were expected to be the primary "image maker" for the restaurant, meaning that they were to wait on customers and be the customer's first point of contact.  (Slack Dep. 79-80.)  The RGMs often spent a minimum of three hours per day operating the cash register.  (Simon Dep. 119.)  They also assisted with food preparation and maintaining the cleanliness of the restaurant – sometimes spending up to four hours a day on each of these activities.  (Simon Dep. 119.)

Because it is undisputed that the RGMs spent in excess of fifty percent of their time on non-managerial activities, the Court must determine whether the other factors support Defendants' contention that management was the RGMs' primary duty.

    a. <u>Relative importance of the managerial duties as compared with the other types of duties</u>

The RGMs make the same arguments advanced by the TCGMs with respect to whether managerial or non-managerial tasks were relatively more important: (1) the fact that their job description lists work done by subordinate employees as one of their "principle (sic) tasks"; and (2) their non-managerial duties are more important to Defendants because Defendants' primary motivation was to minimize labor costs.  (Pl.'s Class E Br. at 11-14.)  For the same reasons discussed above in connection with the TCGMs, these arguments are unavailing.

The RGMs also claim that management was not their primary duty because the restaurants would continue to operate in their absence.  (Pl.'s Class E Br. at 21-22.)  They argue that Defendants employ Shift Supervisors who were hourly employees and did much of the same managerial work that they did.  (*Id*.; Court Doc. 125, Pl.'s Statement of Facts

-31-

Class E ¶ 39.) While the Court acknowledges that the Shift Supervisors did *some* of the managerial tasks that the RGMs also handled – including directing subordinate employees' work and assisting with training new employees – they were not involved with the most important tasks to the overall success of the restaurant. For instance, the RGMs interviewed the restaurants' applicants and were a significant part of the hiring process, along with the TCGMs. The RGMs completed the weekly schedules. They ordered the inventory necessary to keep the restaurant up and running. The RGMs have not pointed to any evidence showing that the Shift Supervisors did any of these important tasks. Accordingly, their claim that the restaurants would continue running in their absence is not persuasive.

Instead the Court finds that, as with the TCGMs, if the RGMs failed to perform their non-managerial duties, their restaurants would still function, albeit much less effectively. Customers may have to wait longer for their food and/or eat in a less clean environment. The same is not true if the RGMs failed to perform their managerial duties. The restaurants would cease to function altogether if they did not hire employees and ensure that they were properly trained, complete the weekly schedule, and order the food supplies. This strongly suggests that management was the RGMs' primary duty. *See Thomas*, 506 F.3d at 506 (where business would cease to function if plaintiff failed to perform her managerial duties this factor strongly suggested that management was her primary duty).

Accordingly, the Court holds that the first factor weighs heavily in favor of a finding that the RGMs' primary duty was management.

        b.    <u>Frequency with which the employee exercises discretion</u>

As with the TCGMs, the evidence shows that the RGMs did not frequently exercise

much discretion.  The RGMs were subject to the same corporate policies as the TCGMs and these policies also limited the RGMs' discretion when ordering inventory, hiring employees, giving raises, marketing their products, and completing performance evaluations.  (Biebinger Decl. ¶¶ 6-12; Simon Decl. ¶¶ 6-15; Washington Decl. ¶¶ 6-15; Slack Decl. ¶¶ 5-13.)

The evidence shows that at least some RGMs exercised more discretion than did the TCGMs with regard to directing employee work.[5]  The RGMs who managed an Arbys or a Wendy's restaurant worked on a daily basis with a substantial number of subordinate employees.  They had the discretion to direct the work of those employees and to allocate tasks depending on the needs of the restaurant.   (Nelson Dep. 99; Slack Dep. 68.) Moreover, some RGMs were required to make judgment calls when ordering product and inventory for their restaurants because how much to order was based on their expectation of sales.  (Nelson Dep. 106.)  The RGM looked at the prior year's sales and estimated his or her need in placing the order.  (*Id*.)

Like the TCGMs, however, the RGMs did not exercise a significant amount of discretion with regard to matters of importance.  Most RGMs had to get approval from their TCGMs or Region Managers to hire employees, give raises, and fire employees.  They were given a strict labor budget by Defendants and were disciplined for exceeding that budget.  They had no input on what products were sold at their restaurant or how those

---

[5]        The Court notes that there are some differences in the descriptions of the RGMs' duties based on the fact that there are different variations of restaurants in the Travel Centers.  For instance, the RGM at a Subway restaurant in a Travel Center appears to have supervised and worked on a daily basis with fewer employees than did an RGM at a Wendy's or an Arbys.  (Compare Simon Decl. ¶ 8 to Slack Decl. ¶ 4.) This affected the frequency with which they were required to exercise discretion in directing the work of their subordinate employees.

products were marketed. Overall, they had little ability to impact the profitability of their restaurants and, accordingly, little discretion with regard to "matters of importance."

Accordingly, the second factor weighs in favor of finding that management was not the RGMs' primary duty.

c.    <u>Employee's relative freedom from supervision</u>

It is undisputed that the RGMs were the highest ranking employees at their respective restaurants. They were subordinate, however, to the TCGMs in the hierarchy of the overall Travel Centers. (Biebinger Dep. 81.) The TCGMs had ultimate authority on staffing the restaurant and either made the hiring decisions or were consulted by the RGMs before employees were hired. (Biebinger Dep. 31; Washington Dep. 80; Simon Dep. 43.) The TCGMs also decided whether raises were warranted for the restaurant employees and were normally involved with disciplining them, up to and including termination. (Simon Dep. 43; Abt Dep. 73; Trejo Dep. 130.) The TCGMs could alter the weekly schedules prepared by the RGMs. (Washington Dep. 68.) The RGMs had daily interaction with their TCGMs. (Biebinger Dep. 60.)

The RGMs also met or talked with with the Region Managers about once a week to go over issues such as where the restaurant was on inventory and labor costs and how the RGM could improve restaurant operations and cleanliness. (Abt. Dep. 23, 28.) Additionally, a restaurant specialist employed by Defendants was in contact with the RGMs once or twice a month. (Abt Dep. 32.)

While this suggests that the RGMs had some oversight on a daily basis, an individual need not be the highest ranking employee on the premises to have management as one's primary duty. *See Kastor v. Sam's Wholesale Club*, 131 F.Supp.2d 862, 868

-34-

(N.D. Tex. 2001) (finding that management was bakery supervisor's primary duty even though there was an overall store manager who outranked him). Although they were not the highest ranking employees on the premises, the RGMs still operated on a day-to-day basis without substantial oversight. While the TCGMs handled many of the personnel issues for the restaurants (e.g., hiring, firing, giving raises), the TCGMs were not involved with the day-to-day operations of the restaurants. The RGMs were solely responsible for directing the work of the subordinate employees and ensuring that the restaurants ran smoothly. They held monthly meetings with the restaurants' employees to discuss the operation of the restaurants – the TCGMs did not attend these meetings. (Abt Dep. 51.) They handled complaints from the restaurants' employees and customers. (Biebinger Dep. 85-86; Trejo Dep. 110.) Perhaps most importantly, the RGMs understood themselves to be ultimately "responsible for everything that went wrong" in the restaurants. (Simon Dep. 49; Nelson Dep. 91.)

Moreover, the fact that the TCGMs had final decision-making authority on a number of issues with regard to the restaurants does not mean that management is not the RGMs' primary duty. As noted by one court:

> If final decision-making authority were the test for determining whether a person was an executive or administrative employee, one would rarely, if ever, qualify as such an employee under the regulations. A president or chief executive officer of a company could say that he does not have final decision-making authority because he is only authorized to carry out the policies set by the board of directors, and the board of directors is free to review and veto his decisions. Typically, there is a hierarchy or line of supervision in any corporate entity or business wherein managers and supervisors have persons to whom they must report, and that an individual does not have final supervisory or discretionary authority does not take that person out of the realm of being a

-35-

> manager or supervisor in the company or business. That [the plaintiff] had to obtain approval from his immediate supervisor from time to time on matters pertaining to bakery employees, or obtain capital expense approval from the general manager or regional director before purchasing equipment of significant costs, in no way diminishes his role as supervisor or manager over the bakery department.

*Kastor*, 131 F.Supp.2d at 865-68. Similarly, the fact that the RGMs had to get approval from the TCGMs on staffing issues does not diminish their role as managers of the restaurants.

Viewing the facts in the light most favorable to the Restaurant General Managers, it is clear that they operated relatively free from supervision the majority of the time. Accordingly, the third factor weighs in favor of finding that management was the RGMs' primary duty.

         d.    <u>Relationship between the employee's salary and the wages paid to other employees for similar nonexempt work</u>

The RGMs were required to work at least fifty hours per week. (Washington Decl. ¶ 5.) The evidence shows that they actually worked between fifty and seventy hours a week. (Washington Decl. ¶ 5; Biebinger Decl. ¶ 5; Simon Decl. ¶ 5; Slack Decl. ¶ 4.) One RGM has stated that he worked anywhere from sixty-five to eighty hours per week. (Gant Dep. 121.)

With regard to salary, the RGMs' average annual wage was $33,615.82, plus a possible quarterly bonus. (Romano Decl. ¶ 8.) They often did not receive a quarterly bonus and some RGMs could not remember ever receiving a bonus. (Biebinger Decl. ¶ 4.)

-36-

Assuming that the RGMs worked sixty hours a week and not counting any bonuses paid, they made an average of $10.77 per hour.[6] The hourly employees that they supervised generally made between $6.00 and $8.00 per hour. (Peel Dep. 90; Beibinger Dep. 90.) Some of the more senior hourly employees may have made in excess of $9.00 an hour. (Washington Dep. 112.) Using the average hourly employee salary of $7.00 per hour[7], the RGMs were paid over forty percent more than the employees they supervised. Using the highest rate paid to an hourly employee ($9.00/hour), the RGMs were paid twenty percent more than the employees that they supervised.

The Sixth Circuit has held that when a manager makes thirty percent more than her subordinates for similar work, this factor weighs in favor of finding that management is the employee's primary duty. *Thomas*, 506 F.3d at 509. Here, the RGMs were paid between twenty and forty percent more than the hourly workers. Accordingly, the fourth factor weighs in favor of finding that the RGMs had management as their primary duty.

e.    Conclusion

Although it is undisputed that the RGMs spent at least eighty percent of their time performing non-managerial tasks, the Court does not give significant weight to the time factor because the RGMs readily admit that while they were waiting on customers or cleaning up the restaurant, they were supervising subordinate employees. (Trejo Dep. 80; Abt Dep. 49; Beibinger Dep. 54.) "Where an employee manages while at the same time performing non-exempt tasks normally assigned to subordinate employees, we refuse to

---

[6]    The parties do not discuss the Restaurant General Managers' vacation schedule, if any, so this figure assumes that they worked fifty-two weeks per year.

[7]    $8.00 + $6.00 = $14.00 ÷ 2 = $7.00.

give undue weight to the time factor of the primary duty inquiry." *Thomas*, 506 F.3d at 504 (internal citations and quotations omitted).

"Generally exempt executives make the decision regarding when to perform nonexempt duties and remain responsible for the success or failure of business operations under their management while performing nonexempt work." 29 C.F.R. § 541.106 (2004).[8] The RGMs had overall supervisory responsibility for the entire restaurant and had the authority to assign workers, including themselves, to different tasks. (Nelson Dep. 91; Simon Dep. 107; Abt Dep. 63; Slack Dep. 68.) The RGMs understood themselves to be "responsible for everything that went wrong" in the restaurants, even if they were not on the premises at the time of the infraction. (Simon Dep. 49, 89.)

Three of the four factors analyzed above weigh in favor of finding that management was the RGMs' primary duty. The time factor and the frequency of the exercise of discretion weigh in the RGMs' favor, but the Court does not give the time factor significant weight given that the RGMs were concurrently supervising their subordinate employees while performing the non-managerial tasks. Ultimately, the Court concludes that, viewing the facts in the light most favorable to the Plaintiffs, there is no genuine dispute that management was the RGMs' primary duty.

Accordingly, Defendants have met their burden with regard to each element of the executive exemption and their Motion for Summary Judgment as to Class E Defendants is **GRANTED**.

---

[8] The Court acknowledges that the quoted regulation did not become effective until 2004 but relies on it as a succinct statement of the pre-existing case law. *See* 69 Fed. Reg. 22,122-01 (Apr. 23, 2004) ("The Department believes that the proposed and final regulations are consistent with current case law which makes clear that the performance of both exempt and nonexempt duties concurrently or simultaneously does not preclude an employee from qualifying for the executive exemption.").

### C.     Travel Center Co-Managers

With respect to the TCCMs, the issues before the Court are: (1) whether management was the TCCMs' primary duty; (2) whether the TCCMs customarily and regularly directed the work of two or more employees, (3) whether the TCCMs had the authority to hire and/or fire other employees.  The Court will address each such issue in turn.

#### 1.     _Management as a Primary Duty_

It is undisputed that the TCCMs performed a number of duties that are classified as management under the regulations.   They assisted with training new employees. (Allen Decl. ¶ 14; Hughes Decl. ¶ 10.)   They responded to employee and customer complaints.  (Allen Decl. ¶ 14; Hughes Decl. ¶ 18; Kempton Decl. ¶ 12.)  They had the authority to direct work of the hourly employees, although they were often not able to do so due to a lack of staff.  (Hughes Decl. ¶ 12; Morgenstern Decl. ¶ 9.)  They ordered inventory necessary to stock the Travel Center and ran end-of-shift reports. (Morganstern Decl. ¶¶ 10, 14.)   They conducted interviews of applicants and sometimes counseled employees, but were not authorized to make the final decision on hiring or firing employees.  (Allen Decl. ¶ 5; Hughes Decl. ¶ 9.)

It is also undisputed, however, that the TCCMs spent the vast majority of their time performing non-managerial duties.   In fact, the evidence shows that the TCCMs spent between eighty and ninety-five percent of their time on their non-managerial duties.   (Beeton Decl. ¶ 12; Allen Decl. ¶ 13; Bishop Decl. ¶ 12.)   They were often operating the cash register.  (Allen Decl. ¶ 13; Smith Decl. ¶ 17.)  They restocked the

-39-

shelves and arranged the displays. (Allen Decl. ¶ 13; Wentz Decl. ¶ 10.) They cleaned the restrooms and showers and performed general maintenance on the Travel Centers. (Smith Decl. ¶ 17; Sylvia Decl. ¶ 16.) They performed inventory counts of the cigarettes and electronics. (Morgenstern Decl. ¶ 13.)

Because it is undisputed that the TCCMs spent greatly in excess of fifty percent of their time performing non-managerial tasks, the Court must consider the other factors to determine whether management was their primary duty.

a. Relative importance of the managerial duties as compared with non-managerial duties

Defendants argue that the importance of the management duties performed by the TCCMs outweighs the importance of the non-management tasks completed during a typical work shift. (Court Doc. 110-2, Def.'s Br. Class D at 23.) Defendants assert that the TCCMs' management duties included hiring employees, training new employees, and scheduling employees to work. (Def.'s Br. Class D at 17; see also Court Doc. 110-3, Def.'s Class D Statement of Facts ¶¶ 10-18.) Defendants contend that if the TCCMs did not carry out their management job duties, the Travel Centers would not function. (Def.'s Br. Class D at 23.) In short, Defendants argue that the TCCMs are "in charge" of their stores on a day-to-day basis, and this the value of their management tasks outweighs any value of incidental non-exempt work they perform.

The TCCMs counter that Defendants' characterization of their management tasks is based upon the job descriptions formulated shortly after the initiation of the instant case. (Court Doc. 127, Pl.'s Br. Class D at 6.) The TCCMs also argue that Defendants' reliance on such descriptions, which don't accurately reflect the TCCMs'

actual job duties, should be rejected as a matter of law.  (*Id*. citing *Thomas*, 506 F.3d at

503-04*; Schaefer*, F.3d at 400-01.)  The Court agrees that it need not give much weight

to the Defendants' job descriptions because Defendants admit that they contain only

the "general responsibilities" for the TCCMs.  (Parmly Dep. 70.)  In preparing the job

descriptions, Defendants did not conduct any investigation into the actual tasks

performed by the TCCMs or the actual amount of time spent by the TCCMs on the

"general responsibilities" listed in the job descriptions.  (*Id*. at 73.)  Accordingly, as with

the TCGMs and the RGMs, the Court will analyze the *actual* duties of the TCCMs rather

than rely upon Defendants' generalized job descriptions.  *See Thomas*, 506 F.3d at

503-04.

Moreover, Defendants' description of the TCCMs' managerial responsibilities

overstates the evidence.  Defendants attempt to analogize the TCCMs with the plaintiff

in *Thomas*.  (Def.'s Class D Br. at 23.)  In *Thomas*, the Sixth Circuit held that the

plaintiff's management duties were more important than her non-management duties

because her store "cannot operate if it has not hired any employees, has not scheduled

any employees to work, or has not trained its employees on rudimentary procedures

such as operating the register."  506 F.3d at 505.  The evidence, viewed in the light

most favorable to the Plaintiffs, shows that the TCCMs do not make hiring decisions, do

not schedule the employees (or if they do that schedule is subject to approval by the

TCGM), and are not solely responsible for training new employees.  In short, the

TCCMs management responsibilities fall far short of those described in *Thomas*.

The TCCMs' most compelling argument in support of their claim that their non-managerial duties were more important than their managerial duties is the fact that the majority of the management duties that they completed were also completed by non-exempt hourly employees. Shift Supervisors, an hourly position at the Travel Center, were responsible for counting money, directing employees, responding to customer and employee complaints, and performing inventory counts while on duty. (Bishop Decl. ¶ 15; Hughes Decl. ¶ 23.) Office Administrators, who were also hourly employees, were responsible for ordering supplies, doing the end-of-shift reports for the cashiers, and addressing equipment malfunctions. (Hughes Decl. ¶ 22; Gullickson Decl. ¶ 14.) Leslie Hughes, a TCCM who previously worked as a Shift Supervisor, testified that she was routinely left in charge of the Travel Center when she was a Shift Supervisor. (Hughes Dep. 18.) With the Shift Supervisors and Office Administrators able to handle many of the same management tasks as the TCCMs, Defendants' argument that the Travel Centers would cease to function in the absence of the TCCMs is not persuasive. A reasonable fact-finder could conclude that the Travel Centers could potentially still function in the absence of any of the TCCMs.

The TCCMs contend that they were merely low cost replacements for non-exempt employees because the Defendants' labor budget restrictions shifted non-exempt work from hourly employees onto the salaried managers. (Allen Dep. at 131-132.) The evidence shows that many of the TCCMs spent an extensive amount of time on non-managerial tasks because they were routinely short-staffed due to inadequate labor budgets. (Fedele Decl. ¶7; Gullickson Decl. ¶¶ 4-5; Slyvia Decl. ¶¶ 4, 6-7.) The TCCMs' management duties were routinely put off in order to address the more

-42-

pressing immediate non-managerial tasks. (Pls.' Class D Stip. Facts ¶¶ 14-16, 18-31.) TCCMs were forced to spend time after their shifts ended – sometimes a few hours – on their remaining managerial duties. (*Id.*) The prioritizing of non-managerial work over managerial work demonstrates that there are genuine issues of material fact with respect to whether the TCCMs' performance of management duties was of primary importance to Defendants. *See Smith*, 418 F. Supp. 2d at 1135. Moreover, the apparent interchangeability of Shift Supervisors and Office Administrators with the TCCMs raises a significant question as to whether the TCCMs' primary value was management or as a low-cost alternative to the Shift Supervisors and Office Administrators.

Accordingly, this factor in the primary duty analysis weighs against finding that the TCCMs' primary duty was management.

        b.    <u>The Frequency With Which An Employee Exercises Discretion and Freedom From Supervision</u>

Under these particular circumstances, the Court finds that the "discretionary powers" and "freedom from supervision" factors are best analyzed together. *See Smith*, 418 F. Supp. 2d at 1136-1139. Defendants have presented evidence that the TCCMs exercised discretion over some managerial tasks, including oversight of subordinate employees, responsibility for implementation of corporate policies, and serving as Defendants' on-site representative. (Defs.' Class D Stip. Facts ¶¶ 9-12, 15, 17-79, 22, 25 and 30.) The TCCMs argue that Defendants' detailed corporate policies significantly limited their discretion on a day-to-day basis and governed the manner in which such managerial tasks were to be completed.

-43-

The Court has previously found that Defendants' corporate policies significantly limited the discretion of the TCGMs.  (*See supra* Section IV. A. 2.)  The same reasoning applies here and is even more compelling as applied to the TCCMs.  For instance, while the TCGMs had the authority to add their own list of instructions to the work lists, the TCCMs did not have the discretion or authority to alter these directives.  In addition, many of the managerial tasks completed by the TCCMs were subject to approval by the TCGMs.  If a TCCM completed the weekly schedule for the hourly employees, it had to be approved by the TCGM.  Only the TCGM could hire employees, the TCCMs were limited to conducting brief introductory interviews.  This evidence strongly suggests that there is a genuine issue of material fact as to whether the TCCMs regularly exercised a significant amount of discretion – especially as to matters of importance.

Defendants also contend that the TCCMs operated with little oversight and were regarded as being sufficiently free of direct supervision to satisfy this factor of the test.  (Defs.' Class D Stip. Facts ¶ 30.)   The TCCMs, however, have presented contradictory evidence which indicates that they were extensively monitored by the Region Managers and TCGMs.  (Pls.' Class D Stip. Facts ¶¶ 19, 22-25, 28, 37.)  As noted above, many of the TCCMs' managerial tasks were closely supervised by the TCGMs. Morevoer, it is undisputed that the TCCMs were not the highest ranking employees at the Travel Centers.  While this does not foreclose the possibility that management could be the TCCMs' primary duty, it is a factor that the Court must consider.

Viewing the evidence in the light most favorable to Plaintiffs, there are clearly genuine issues of material fact regarding the TCCMs' relative freedom from supervision and the amount of discretion that they exercise.  Accordingly, the Court finds that the

-44-

second and third factors weigh against finding that management was the TCCMs' primary duty.

c. The relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the supervisor

In analyzing this factor, the Court is bound to consider the "relationship between the employee's salary and the wages paid to other employees" for the same kind of nonexempt work. 29 C.F.R. § 541.700(a); *Thomas*, 506 F.3d at 504. The Court finds unpersuasive Defendants' argument that "the 'fact' that [Defendants] use hourly shift supervisors is irrelevant as it is not determinative as to whether or not [TCCMs] are properly classified as exempt." (Court Doc. 139-1, Defs.' Resp. and Objection to Pl.'s Class D Stip. Facts at ¶ 41.) While the Defendants' usage of the Shift Supervisors is not determinative as to whether management was the primary duty of the TCCMs, it is certainly relevant in many regards. As discussed *supra*, the TCCMs share many of the same duties as the Shift Supervisors and the Office Administrators. Accordingly, the Court finds that it is appropriate to compare the salary of the TCCMs to the wages paid to these hourly employees.

The evidence shows that Shift Supervisors earn between $8.00 and $14.00 an hour and averaged about $10.00 an hour. (Smith Decl. ¶ 19; Hughes Decl. ¶ 23; Sylvia Decl. ¶ 17; Kempton Decl. ¶ 21.) As hourly employees, they were paid time and a half for any hours worked in excess of forty per week. (Kempton Decl. ¶ 21.)

The TCCMs consistently testified that they worked between fifty and seventy hours a week but sometimes worked as many as ninety hours per week. (Kempton Decl. ¶ 5; Morgenstern Decl. ¶ 4; Gullickson Decl. ¶ 4; Sylvia Decl. ¶ 4.) The average

salary for the TCCMs was $32,826.00. (Romano Decl. ¶ 11.) Assuming a sixty-hour work week, the TCCMs earned $10.52 an hour.[9] Thus, the TCCMs were paid just over five percent more than the average rate that a Shift Supervisor or Office Administrator was paid for the same work. The pay differential here is far less than that in which courts have found management to be the employee's primary duty. *See Thomas*, 506 F.3d at 509 (manager paid thirty percent higher established sufficient difference in wages between exempt manager and hourly employees).

Moreover, the TCCMs were actually paid less on a weekly basis than the Shift Supervisors or Office Administrators would have been paid for the same amount of work. Had the Shift Supervisors or Office Administrators worked a sixty hour week, their weekly salary would have been $700. Because they were not paid overtime compensation, the TCCMs' weekly salary for their sixty hour week was only $631.27. Accordingly, the relationship between the TCCMs' salary and the wages paid to other employees for the same work weighs against finding that management was the TCCMs' primary duty.

d. <u>Conclusion</u>

It is undisputed that the TCCMs spent the vast majority of their time performing non-managerial duties. As discussed above, the remaining factors also weigh against a finding that management was their primary duty. There are certainly facts in dispute as to whether the duties and responsibilities of the TCCMs differed from the duties and

---

[9] The parties do not discuss the TCCMs' vacation schedule, if any, so this figure assumes that they worked fifty-two weeks per year.

responsibilities of the Shift Supervisors and the Office Administrators.  These factual disputes make summary judgment inappropriate.

Accordingly, the Court finds that Defendants have failed to meet their burden with respect to the second element of the executive exemption by failing to demonstrate that there is no genuine issues of material fact in dispute as to whether management was the TCCMs' primary duty.

### 3. *Supervising two or more employee*

There is extensive evidence in the record that establishes that the TCCMs regularly worked alongside between two and fifteen employees per shift. (Defs.' Class D Stip. Facts ¶ 8.)  As opposed to the Court's analysis with respect to the RGMs, it is undisputed that the TCCMs were physically present with two or more employees the majority of the time that they were on duty.  (Bond Dep. 32-33; Gullickson Dep. 24; Lara Dep. 30-32.)

Instead of arguing that they did not physically oversee the work of two or more employees, the TCCMs argue that they were not "supervising" the hourly employees with whom they worked because their role was merely to remind the hourly employees of work-list tasks that had yet to be completed.  (Pls.' Class D Br. at 21.)  Such an argument, however, has been repeatedly rejected.  "Ensuring that company policies are carried out constitutes the very essence of managerial work." *Donovan v. Burger King*, 672 F.2d 221, 226 (1st Cir. 1982).  Although the TCCMs argue that they did not spend much time directing the work of their subordinate employees, they do not dispute that they had the authority to do so.  (Beeton Decl. ¶ 9; George Decl. ¶ 9.)  It is therefore undisputed that one of their managerial tasks, though perhaps not often exercised, was

-47-

the ability to direct the work of the hourly employees. Plaintiffs' argument that they did not "direct" the work of their subordinates because they lacked discretion due to strict company policies is more appropriately analyzed under the primary duty element.

Accordingly, there is no material factual dispute as to whether the TCCMs were customarily and regularly directing the work of two or more employees. *See Aguirre v. SBC Commc'ns, Inc.*, 2007 WL 2900577, *24 (S.D. Tex. 2007) (manager directed the work of subordinate employees even though employer had put out "detailed protocols for employee behavior" and manager merely enforced those policies). Defendants have met their burden with respect to this element of the executive exemption analysis.

3. *Authority to Hire and Fire*

Thirty-four of the opt-in Plaintiffs served as TCCMs after August 22, 2004, the effective date of the amended FLSA regulations. (Romano Decl. ¶ 17.) Defendants are therefore required to show that these TCCMs had "the authority to hire or fire other employees or his suggestions and recommendations as to the hiring, firing, advancement, promotion or other change of status of other employees are given particular weight." 29 C.F.R. § 541.100.

In addressing this portion of the regulations, Defendants overstate the involvement that the TCCMs had in hiring. The TCCMs have presented evidence that they had little, if any, role in the hiring and firing of employees. (Pls.' Class D Stip. Facts ¶ 22.) The TCCMs may have conducted an interview from time to time, but they were not integrally involved in the hiring process. (George Decl. ¶ 6; Gullickson Decl. ¶ 6.) For example, Michael Breeton participated in a few on-the-spot interviews but he was never the sole interviewer and it was not his decision whether the applicant was

-48-

hired. (Breeton Decl. ¶ 5.) Sherry Bishop testified that while she may have shared her impression of job applicants with the TCGM, she did not consider this input a substantive hiring recommendation and did not make the final hiring decisions. (Bishop Dep. 43.)

Moreover, the Court notes that Defendants have failed to meet their burden under the regulations because there is no evidence that Defendants gave any "particular weight" to recommendations offered by the TCCMs. Defendants' briefing fails to provide sufficient evidence from which a fact-finder could conclude that the TCCMs' job duties included making such suggestions and recommendations. (*See* Defs.' Class F Br. at 21-22; Court Doc. 140, Defs.' Class F Reply Br. at 22-23.) Defendants have also failed to provide the Court with evidence which establishes the frequency with which such suggestions and recommendations were made or requested and the frequency with which the TCCMs' suggestions and recommendations were relied upon. (*Id.*) Absent such evidence, Defendants have failed to meet their burden in establishing that the TCCMs had the authority to make hiring and firing decisions. *See* 29 C.F.R. § 541.105.

Accordingly, the Court finds that Defendants have failed to meet their burden with respect to the fourth element of the executive exemption analysis with respect to the thirty-four TCCMs to which it applies.

      d.    *FLSA Statute of Limitations*

Having found that Defendants are not entitled to summary judgment as to liability, the Court must now determine whether summary judgment is appropriate on

the issue of damages. Ordinarily, a violation of the FLSA is subject to a two-year statute of limitations. *See* 29 U.S.C. § 255. If, however, the cause of action arises out of a willful violation of the Act, the statute of limitations is extended to three years. *Id*. In reviewing the scope of this exception, the Supreme Court held in *McLaughlin v. Richland Shoe, Inc.*, 486 U.S. 128 (1988), that the Secretary must prove that the "employer either knew or showed reckless disregard for whether its conduct was prohibited by the statute." *Id.* at 133; *Hazen Paper Company v. Biggins*, 507 U.S. 604, 614-15 (1993) (following *Richland Shoe*).

Applying this standard, the Sixth Circuit in *Dole v. Elliott Travel & Tours*, 942 F.2d 962 (6th Cir. 1991) held that a defendant, who had "actual notice of the requirements of [] FLSA by virtue of earlier violations, [who agreed] to pay unpaid overtime wages, and [who assured his] future compliance with [] FLSA[,]" satisfied the willfulness standard of *Richland Shoe*. *Id.* at 967. The employer bears the burden of establishing both a subjective and objective good faith defense against a liquidated damages award. *Martin v. Indiana Michigan Power Co.* 381 F.3d 574, 584 (6th Cir. 2004) (internal citations omitted).

In the instant case, Defendants argue that the evidence establishes that based on a 2001 audit, they reasonably believed that the TCCMs were properly classified as exempt. The 2001 audit was conducted in response to a DOL investigation concerning the classification of a number of Defendants' non-exempt employees. Defendants prepared and distributed a survey to all of its Restaurant Co-Managers to investigate

-50-

whether it had properly classified these employees as exempt.  (Defs.' Class F Br. at 24-25.)

Defendants sent out surveys to 150 locations and received approximately 70 responses.  (*Id.*)  After reviewing the surveys, Defendants concluded that the Restaurant Co-Managers were properly classified as exempt.  (*Id.*)  Because Defendants considered the Restaurant Co-Managers to be the lowest ranking exempt employees, and given the fact that the survey results indicated that they were properly classified as exempt employees, Defendants assert that they assumed that the remaining exempt employees were also properly classified. (*Id.*)

The TCCMs argue that Defendants have failed to present sufficient evidence to meet their burden in this regard, and the Court agrees.  While Defendants claim the responses to the surveys supported a finding that RCMs were exempt employees, Defendants have not disclosed the contents of the completed surveys.  (Pls.' Class F Br. at 30.)  The Court cannot rely upon unsupported conclusory statements by the Defendants because the survey's results are not competent summary judgment evidence.  *See* Fed. R. Civ. P. 56(e); Fed. R. Evid. 802, 1002.

Moreover, Defendants reclassified all TCCMs in the state of California as non-exempt employees.  (Greufe Dep. I 38.)  No studies were done to examine the job duties of these individuals prior to or after their reclassification and the day-to-day activities of these individuals did not change upon reclassification.  (Parmly Dep. 133-35; Kelly Dep. at 30.)  A TCCM in California does the same job as a TCCM outside of California.  (Parmly Dep. 57-58, 118-19.)  This evidence suggests that there is at least a

genuine factual dispute as to whether Defendants' continued classification of all TCCMs outside of California as exempt is in good faith.

The Court also concludes, however, that the good faith issue is not appropriate for summary disposition; rather it is a determination to be made only in the event the fact-finder (the Court in this instance) ultimately concludes, after considering *all* the evidence, that the TCCMs were misclassified as exempt executives. *Smith*, 418 F. Supp. 2d at 1138 n. 8.

Accordingly, and for all the above-stated reasons, Defendants have not met their burden and their Motion for Summary Judgment as to Class D Plaintiffs (Travel Center Co-Managers) is **DENIED**.

### D. Restaurant Co-Managers

With respect to the RCMs, as with the TCCMs, the three main issues before the Court are: (1) whether management was the RCMs' primary duty; (2) whether the RCMs customarily and regularly directed the work of two or more employees, (3) whether the RCMs had the authority to hire and/or fire other employees. The Court will address each issue in turn.

#### 1. *Management as Primary Duty*

It is undisputed that the RCMs performed some tasks that the regulations classify as management. They assumed some responsibility for training new hourly employees. (Stocking Dep. 23.) They directed the work of the hourly employees during their shifts and had the authority to move an employee from one task to another.

(Stocking Dep. 37; Gasper Dep. 40.) They responded to customer complaints. (Stocking Dep. 37; Gasper Dep. 33; Hurd Dep. 57-58.)

While the RCMs may have had input on staffing issues, however, they were not ultimately responsible for hiring, firing or disciplining employees. (Penrod Decl. ¶ 14; C. Ramsey Decl. ¶ 7.) They did not participate in the hourly employees' performance reviews. (Penrod Decl. ¶ 13.) Most RCMs had no control over the weekly schedule. (Penrod Decl. ¶ 12; C. Ramsey Decl. ¶ 10.) Of those RCMs that did complete the weekly schedule, it was subject to approval by their RGM and TCGM. (Slack Decl. ¶ 6.)

It is also undisputed that the RCMs spent the vast majority of their time performing non-managerial tasks. In fact, the evidence shows that the RCMs spent eighty to ninety percent of their time on non-managerial tasks. (Penrod Decl. ¶ 11; Ramsey Decl. ¶ 9.) The RCMs were responsible for operating the cash register, assisting with food preparation, working the drive-through window, and cleaning the restaurant. (Penrod Decl. ¶ 11; Slack Decl. ¶ 14; Ramsey Decl. ¶ 9.)

Because it is undisputed that the RCMs spent greatly in excess of fifty percent of their time performing non-managerial tasks, the Court must evaluate the remaining factors to determine whether management was their primary duty.

a. The Relative Importance of the Managerial Duties as Compared with Other Types of Duties

Defendants argue that the importance of the management duties performed by the RCMs outweighed the importance of the non-management tasks completed during a typical work shift. (Court Doc. 113-2, Def.'s Br. Class F at 23.) Defendants claim that if the RCMs did not carry out the management job duties, the restaurants located at

-53-

Defendant's travel centers would not function. (*Id.*) In short, Defendants argue that the RCMs are "in charge" of their stores on a day-to-day basis, and this the value of their management tasks outweighs any value of incidental non-exempt work they perform.

The RCMs counter this argument by pointing out that Defendants' characterization of the RCMs' management tasks are based upon the job descriptions formulated shortly after the initiation of the instant case. (Court Doc. 131, Pl.'s Br. Class F at 6.) For the same reasons explained above in connection with the TCCMs, the Court will largely ignore the Defendants' generalized descriptions of the RCMs' job duties and will instead analyze the RCMs' actual duties.

The RCMs contend that Defendants' restrictive labor budgets shifted non-exempt work from hourly employees onto the salaried RCMs. (Pl.'s Br. Class F at 13-14; *see also* Court Doc. 132, Plaintiff's Class F Statement of Facts ¶ 14.) RCMs were pressured to limit overtime, but were still required to meet rigorous service standards. (Lampert Dep. 61-62.) The RCMs argue that such cost-cutting initiatives resulted in the RCMs being used as virtually no-cost replacements for non-exempt employees. (Pl.'s Br. Class F at 11, 14.)

There is significant evidence in the record that the RCMs spent the majority of their time performing non-management duties, such as taking food orders, cooking, and cleaning. (*See* Court Doc. 132, Pl.'s Statement of Facts at ¶19.) For instance, Leslie Ramsey, an RCM, testified that she often worked alone, and spent 95 percent of her time on nonexempt tasks such as preparing food, operating the cash register, cleaning, and stocking the shelves. (L. Ramsey Dep. 66-67, 69.) Carolyn Ramsey, an RCM,

-54-

testified that management would cut hours and send home hourly employees if the labor budget was exceeded – leaving the RCMs to do the non-managerial work. (C. Ramsey Dep. 104.) Michael Lampert, another RCM, testified that his RGM instructed him to closely monitor labor costs, including overtime. (Lampert Dep. 61-62.) He furthered testified that "[y]ou couldn't allow any overtime" and very few hourly employees worked overtime. (*Id.*) Angela Howell, an RCM, testified that the TCGM of her center wanted to put her on salary "just to save the overtime" because "[the manager] was losing money on her bonuses with the overtime." (Court Doc. 130-10, Howell Dep. 129.) A fact-finder could conclude from this evidence that the RCMs' principal value was based upon them completing non-managerial tasks in order to limit overtime costs. *Smith*, 418 F. Supp. 2d at 1135.

Moreover, the RCMs' management duties were substantially similar to the duties of the restaurants' Shift Supervisors. (Pls.' Statement of Facts at ¶ 36.) Shift Supervisors closed out shifts, prepared reports regarding the shifts, and had access to the restaurant's safe in the office. (*Id.*) Shift Supervisors also interviewed and trained new hires. (*Id.*) Defendants called Shift Supervisors "shift managers" and considered them managers who were regularly left in charge of the restaurant. (*Id.*) The main distinction between these two positions is that the RCMs were not entitled to overtime.

In theory, with the Shift Supervisors doing many of the same managerial tasks as the RCMs, the restaurants could continue to operate in the absence of the RCMs. This suggests that management was not the RCMs' primary duty. *Thomas*, 506 F.3d at 505.

-55-

Accordingly, this factor in the primary duty analysis weighs against finding that the RCMs' primary duty was management.

> b. Frequency with which an employee exercises discretion and freedom from supervision

Again, under these particular circumstances, the Court finds that the "discretionary powers" and "freedom from supervision" factors are best analyzed together. *Smith*, 418 F.Supp.2d at 1136-1139. Defendants contend that the RCMs exercised a significant degree of discretion "with respect to matters of importance to the operation of Defendants' restaurant concepts." (Def.s' Class F Br. at 18.) Such "[m]atters of importance include oversight of subordinate employees, responsibility for corporate policies, and serving as the employees' on-site representative." (*Id.*) The RCMs argue that Defendants' detailed Operations Manual and other mandatory company policies left little room for discretionary decision making at their level. (Pl.s' Class F Br. at 15.)

The Court finds that the RCMs did not regularly exercise a significant amount of discretion. Detailed corporate policies significantly limited their discretion on a day-to-day basis because these policies dictated the manner in which such managerial tasks were to be completed. The RCMs did not make pricing, merchandise selection, product placement or budgetary decisions. (Pl.'s Class F Br. at 15.) The RCMs simply followed specific directives set by Defendants' corporate policies and enforced by the Region Managers, TCGMs, and RGMs. (*Id.* at 15-16.) For example, the RCMs would periodically receive a marketing packet from corporate headquarters which included all the signage and other materials that should be set up in the store. (Slack Decl. ¶ 13.)

-56-

The RCMs were not allowed to deviate from the precise instructions contained in this packet. (*Id.*) They also did not have the authority to hire, fire or provide employees any pay increases. (Ramsey Decl. at ¶ 7.)

Defendants contend that the RCMs were responsible for running shifts and directing the day-to-day activities of their restaurants. (Def.'s Class F Stip. Facts ¶ 12.) There is significant evidence, however, that the RCMs operated only within rigid confines of Defendants' wide-ranging uniform company policies and only as directed by their Region Managers, TCGMs, and their RGMs. (Pls.' Class F Stip. Facts ¶¶ 3-12.) Defendants provided step-by-step checklists, detailed manuals, and mandatory corporate policies that governed the manner in which the RCMs were to handle employee complaints, customers' injuries, and damages to Defendants' property. (*Id.* ¶¶ 27, 31.) For example, the few RCMs who did fill out schedules merely filled out the form schedules governed by a restaurant's labor budget; the number of employees scheduled per shift as both expressly and implicitly directed by the budget supplied by Defendants' corporate office. (Pls.' Class F Stip. Facts ¶ 33.) Such schedules were also governed by Defendants' "Best Scheduling Practices" and were subject to approval by the TCGM and RGM. (*Id.*)

The RCMs were also subject to supervision by the Region Manager, the TCGM, and the RGM. (Pls.' Class F Stip. Facts ¶ 33.) As Joseph Gasper, an RCM testified, "the Travel Center General Manager is number one, the restaurant general manger and the then top co-manager on the general Travel Center side are pretty much equal, and then the third rank would be another co-manager on the Travel Center side, and then

after the co-managers on the Travel Center side, you will go down to the co-managers on the restaurant side." (Gasper Dep. 15-16.)

Viewing this evidence in the light most favorable to the RCMs, there are genuine issues of material fact regarding the frequency with which they exercised discretion and the degree of oversight to which they were subjected. Accordingly, the Court finds that the second and third factors weigh against a finding that management was the RGMs' primary duty.

      c.    <u>The relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the supervisor</u>

In analyzing this factor, the Court is bound to consider the "relationship between the employee's salary and the wages paid to other employees" for the same kind of nonexempt work. 29 C.F.R. § 541.700(a); *Thomas*, 506 F.3d at 504. The Court is not persuaded by Defendants' argument that "the 'fact' that [Defendats'] used hourly shift supervisors is irrelevant as it is not determinative as to whether or no RCMs are properly classified as exempt." (*See* Court Doc. 140-2, Defs.' Resp. and Objection to Pl.'s Class F Stipulated Facts at ¶ 35.) As discussed *supra*, the Shift Supervisor and the RCM positions share many of the same duties, including certain supervisory responsibilities. (Slack Decl. ¶ 10 ("Shift leaders are hourly employees for Pilot paid $7-11.50 an hour and were eligible for overtime. When a shift leader was the 'manager on duty' he/she has most of the same job responsibilities and authority as I did when I was scheduled as a 'manager on duty.'").) In fact, many of the RCMs worked as Shift Supervisors prior to being promoted. (Ramsey Dep. 17-18; Gasper Dep. 14-15, 17.) Shift Supervisors were paid on an hourly basis and were eligible for overtime. (Gasper

Dep. 17.) Thus, for the purposes of analyzing this factor, the Court finds that the Shift Supervisors are the appropriate comparator for the RCMs. *See* 29 C.F.R. § 541.700(a).

Shift Supervisors earned more than $8.00 an hour. (Pls.' Class F Stip. Facts ¶ 36.) Defendants contend that the average pay for employees supervised by RCMs was $7.00 an hour. (Defs.' Objection to Pls.' Class F Stip. Facts at ¶ 36.) This argument, however, which includes the hourly pay of all employees, does not to contradict Plaintiffs' assertion that Shift Supervisors made at least $8.00 an hour. Viewing the evidence in the light most favorable to Plaintiffs, the Court finds that the Shift Supervisors made at least $8.00 an hour.

The evidence shows that the RCMs worked fifty-five to seventy hours a week. (Penrod Decl. ¶ 10; Slack Decl. ¶ 4.) The RCMs average starting salary was $25,981.82. (Pls.' Class F Br. at 19.) Assuming a sixty hour work week, the RGMs earned $8.32 an hour – which is only about four percent more than the Shift Supervisor's hourly rate. This hourly rate differential is not so significant that it favors granting Defendants' motion. *See Thomas*, 506 F.3d at 509 (manager paid thirty percent higher established sufficient difference in wages between exempt manager and hourly employees). Moreover, on a weekly basis, the RCMs were actually paid less than the Shift Supervisors for the same amount of work. A Shift Supervisor was paid time and a half for all hours worked in excess of forty each week. Assuming a sixty hour work week at a rate of $8.00 per hour for the first forty hours and $12.00 an hour for the remainder, a Shift Supervisors' weekly salary would be $560.00. For the same sixty hours of work, the RGM would be paid only $499.65.

Accordingly, the Court finds that the difference between the RCMs' salary and that paid to comparable hourly workers weighs against a finding that management was the RCMs' primary duty.

d.     <u>Conclusion</u>

It is undisputed that the RCMs spent greatly in excess of fifty percent of their time performing non-managerial duties. Moreover, the other four factors all weigh against a finding that management was the RCMs' primary duty. Accordingly, the Court concludes that Defendants have failed to meet their burden of demonstrating that there is no genuine issue of material fact in dispute as to whether management was the RCMs' primary duty.

2.     <i><u>Customarily and regularly directed the work of two or more employees</u></i>

Defendants contend that, depending on the type of restaurant, RCMs supervised two to ten employees per shift. Defendants have presented significant evidence that the RCMs frequently manage two or more employees. (Defs.' Class F Stip. Facts ¶ 10.) The RCMs, however, also have presented significant evidence that they oftentimes did not direct the work of two or more employees. (Pls.' Class F Br. at 8-9; Gant Dep. 122-123; Howell Dep. 35-37; Barnett-Ramsey Dep. 42, 62-63; Lambert Dep. 27-28, 75-76.) For example, when the RCMs were scheduled to work on shifts with more senior Restaurant Managers – whether it be another RCM or the RGM – they were not considered the "manager in charge" and were not the individual responsible for directing the activities of the hourly employees. (Ramsey Dep. 31, 47.) This contradictory evidence creates a question of fact which must be resolved at trial. *Craft*

-60-

*v. Allstate Ins. Co.*, No. 07-11631, 2009 U.S. Dist. LEXIS 36232, at *16 (E.D. Mich. April 30, 2009).  Accordingly, the Court finds that there are genuine issues of material fact with respect to the number of employees the RCMs supervised.

        c.      *Authority to Hire and Fire*

Sixteen of the opt-in Plaintiffs worked as RCMs for Defendants after August 22, 2004, the effective date of the amended regulations.  (Romano Decl. ¶ 19.)  For these RCMs, Defendants are also required to show that the RCMs had the authority to hire or fire other employees or that their suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees were given particular weight.  29 C.F.R. § 541.100(a).

Defendants contend that the RCMs were responsible for making termination recommendations.  (Defs.' Class F Stip. Facts ¶ 10.) Defendants also argue that "the Restaurant [Co-Managers] work with the Restaurant General Managers and have responsibility for interviewing employees and making hiring recommendations."  (*Id.* ¶ 3.)

The RCMs argue that Defendants have failed to meet their burden because they have presented no evidence that Defendants gave any "particular weight" to recommendations offered by the RCMs, (Pls.' Class F  Br. at 21-22), and the Court agrees.  Defendants' briefing fails to provide sufficient evidence from which a fact-finder could conclude that the RCMs' job duties included making such suggestions and recommendations. (*See* Defs.' Class F Br. at 21-22; Court Doc. 140, Defs.' Class F Reply Br. at 22-23.)  Moreover, Defendants have failed to provide the Court evidence

which establishes the frequency with which the RCMs' made suggestions and recommendations on personnel issues and the frequency with which the RCMs' suggestions and recommendations were relied upon. (*Id.*) Absent such evidence, Defendants have failed to meet their burden of establishing that the RCMs had the authority to make hiring and firing decisions. *See* 29 C.F.R. § 541.105.

    4.   *FLSA statute of limitations*

Having found that Defendants are not entitled to summary judgment as to liability, the Court must now determine whether summary judgment is appropriate on the issue of damages. As with the TCCMs, Defendants argue that they relied in good faith on the results of their 2001 audit. The audit allegedly showed that the RCMs were properly classified as exempt employees. For the same reasons noted above with respect to the TCCMs, however, the Court finds that Defendants have failed to meet their evidentiary burden on summary judgement. *See* Fed. R. Civ. P. 56(e); Fed. R. Evid. 802, 1002.

Moreover, Defendants have reclassified all RCMs in the state of California as non-exempt employees. (Greufe Dep. I 38.) No studies were done to examine the job duties of these individuals prior to or after their reclassification and the day-to-day activities of these individuals did not change upon reclassification. (Parmly Dep. 133-35; Kelly Dep. at 30.) An RCM in California does the same job as an RCM outside of California. (Parmly Dep. 57-58, 118-19.) This evidence suggests that there is at least a genuine factual dispute as to whether Defendants' continued classifications of all RCMs outside of California as exempt is in good faith.

The Court also concludes, however, that the good faith issue is not appropriate for summary disposition; rather it is a determination to be made only in the event that the fact-finder (the Court in this instance) ultimately concludes, after considering *all* the evidence, that the RCMs were misclassified as exempt executives. *Smith*, 418 F. Supp. 2d at 1138 n. 8.

Accordingly, Defendants have not met their burden and their Motion for Summary Judgment as to Class F Plaintiffs (Travel Center Restaurant Co-Managers) will be **DENIED**.

**VI.    CONCLUSION**

For the reasons explained above, it is **ORDERED** that:

1.    Defendants' Motion for Summary Judgment on the FLSA Claims of Subclass C Plaintiffs (Travel Center General Managers) [Court Doc. 105] is **GRANTED** and all such claims are **DISMISSED WITH PREJUDICE**;

2.    Defendants' Motion for Summary Judgment on the FLSA Claims of Subclass E Plaintiffs (Restaurant General Managers) [Court Doc. 108] is **GRANTED** and all such claims are **DISMISSED WITH PREJUDICE**;

3.    Defendants' Motion for Summary Judgment on the FLSA Claims of Subclass D Plaintiffs (Travel Center Managers) [Court Doc. 110] is **DENIED**;

4.    Defendants' Motion for Summary Judgment on the FLSA Claims of Subclass F Plaintiffs (Restaurant Managers) [Court Doc. 113] is **DENIED**.


SO ORDERED this 29th  day of June, 2009.


_____
        */s/Harry S. Mattice, Jr.*
        HARRY S. MATTICE, JR.
        UNITED STATES DISTRICT JUDGE